# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| JILL P. BROSS  *individually and o/b/o Alan D. Bross Estate*  KACEY LEE BROSS  LOUISIANA WORKERS COMP. CORP. | CIVIL ACTION 06-1523 |
| | JUDGE DOHERTY |
| VS. | |
| | MAGISTRATE JUDGE METHVIN |
| CHEVRON U.S.A INC.  QUALITECH SERVICES, INC.  XL SPECIALTY INSURANCE CO.  EVANSTON INSURANCE CO. | |

## *MEMORANDUM RULING*
### *(Rec. Doc. 165)*

Defendant Chevron filed a motion to quash and for protective order relating to a deposition scheduled for March 24, 2009 (Rec. Doc. 165). Prior to the deposition, the undersigned ruled on the motion via text order, then later reviewed the Root Cause Analysis report (RCA) *in camera*, and held a telephone conference with counsel on the morning of March 24, just prior to the deposition, in order to clarify the ruling. The instant memorandum ruling provides the reasons for the court's ruling. The trial date is May 11, 2009.[1]

### *Background and Argument of Parties*

Plaintiffs allege that on February 28, 2006, Alan D. Bross was killed when he fell through a defective grating panel of an offshore production platform, struck the lower deck, and then fell into the water. Plaintiffs issued a subpoena for the deposition of Tony Ritchey, a Chevron Operations Supervisor who was part of a team which conducted an investigation on March 1, 2006, the day following the accident. The team prepared a root cause analysis report (RCA).[2]

---

[1] Also pending is a Motion for Summary Judgment by Chevron "based upon the open and obvious condition of the Zulu structure." Rec. Doc. 126.

[2] The RCA team members were Mark Terrebonne (now deceased), Tony Ritchey, and Danny Hall.

2

Chevron sought an order quashing the deposition subpoena, and alternatively, a protective order limiting the deposition testimony of Mr. Ritchey to preclude any questioning concerning (1) the contents of the RCA Report, which allegedly comprise attorney-client information/communications and work product; (2) any conversations Mr. Ritchey had with Chevron's counsel Michael Smith, on grounds of attorney-client privilege; (3) any testimony concerning the RCA investigation, including what witnesses said, on work product grounds; and (4) any conversations the RCA team members had with each other concerning their RCA investigation, on work product grounds.[3]

Chevron argues that the RCA was initiated by a "Chevron Legal Charter" on March 1, 2006, prepared by Mr. Smith, which expressly stated the purpose of the RCA was "evaluating Chevron's possible involvement and legal exposure, if any, including regulatory citation...[and] in anticipation of litigation or other proceedings, and all . . . evidence gathered or prepared by the Team shall be held in strict confidence, marked as being such, and subject to the "Attorney Client Privilege."[4] Chevron argues that at the time of the investigation on March 1, 2006, Mr. Smith believed there was a substantial likelihood of litigation against Chevron due to Bross' death:

> Mr. Smith prepared the Legal Charter to commission the gathering of information necessary to provide legal advice to Chevron concerning this incident and to commence preparation of a defense to anticipated civil litigation and possible administrative proceedings conducted by the U.S. Coast Guard and/or the MMS.[5]

---

[3] Chevron also contends that service of the subpoena on Mr. Ritchey was inadequate because it was not personally served. Chevron offers no factual or legal support for this contention, other than a one-line conclusory statement. Accordingly, this argument will not be addressed.

[4] Rec. Doc. 165-2, p. 3.

[5] Rec. Doc. 165-2, p. 2, referencing Declaration of Michael C. Smith, Exhibit 1.

According to Chevron, team members took no written or recorded statements from witnesses they interviewed, but instead took notes the interviews which were turned over to attorney Smith at the conclusion of the investigation. Mr. Ritchey did not keep a copy of the notes, and does not have custody of the RCA report.[6]

Chevron contends that information held by Mr. Ritchey regarding the RCA investigation and conversations between Mr. Ritchey and witnesses he interviewed in preparation for the RCA are intangible work product which is protected from discovery. Chevron cites several out of circuit cases as authority in support of their "intangible work product" argument.[7]

Plaintiffs' argue that this is not an "attorney-client issue,"[8] and that the RCA does not constitute work-product material because it was prepared in the ordinary course of business, not in anticipation of litigation. Plaintiffs characterize the affidavits by Messrs. Smith and Ritchey [9] – that the RCA was prepared in anticipation of litigation – as self-serving, and offer in support of their argument that the RCA was prepared in the ordinary course of business excerpts of the deposition testimony of Gary Chaisson, Chevron's Operations Supervisor, in part as follows:

Q. And the Root Cause Analysis is to formulate some kind of response to the MMS and detail as best you can what happened on February 28, 2006 - - 2006 or 2005?

A. Six.

---

[6] *Ibid.*, p. 4, and Exhibit B. Chevron further notes that the RCA was sought in discovery previously, and was objected to by Chevron as protected from discovery as attorney-client privileged and subject to the work-product doctrine. No motion to compel was filed. *Ibid.*, p. 6, "Unsworn Declaration Under Penalty of Perjury of Paul Anthony Ritchey."

[7] In re Cedant Corp. Securities Litigation, 343 F.3d 658, 662 (3rd Cir. 2003); Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp., 125 F.R.D. 578 (N.D.N.Y. 1989).

[8] *Memorandum in Opposition* (rec. doc. 168), p, 3.

[9] The affidavits of Mr. Smith and Mr. Ritchey are attached to Chevron's memorandum.

> Q. – 2006 in connection with Allen's accident and death?
>
> A. The Root Cause Analysis facilitated a response, but it was done independently of MMS's request. It was done to try to understand and make sure we could avoid any reoccurrence. And that's the Root Cause Analysis that Chevron has done for any incident. It could be an accident, it could be a spill. Anything that is not incident-free, we look at it to see and understand it and take it out of the work process.[10]

Plaintiffs further argue that even if the RCA is work-product, plaintiffs have substantial need of the materials in preparation of their case, and cannot get the equivalent without substantial hardship, by any other means, citing Fed. R. Civ. P. 26(b)(3). Plaintiffs point out that Bross is deceased and cannot provide testimony as to the facts and circumstances of the accident. Plaintiffs state Chevron maintains Bross fell through an open and obvious hole in the platform, while plaintiffs maintain he fell through damaged or defective grating, and argue that "there is a substantial need by Plaintiffs to determine how Chevron's RCA team concluded that Mr. Bross fell through a hole in the platform."[11] Plaintiffs argue that they need Mr. Ritchey's testimony relative to his knowledge of the accident and the condition of the platform at the time of the accident.

In reply, Chevron emphasizes that the RCA Team was created pursuant to a Legal Charter drafted by Mr. Smith, and the Legal Charter expressly stated that the RCA was for the purpose of evaluating Chevron's legal exposure.

Furthermore, Chevron argues that plaintiffs have not demonstrated substantial need for the RCA and unavailability of equivalent materials without substantial hardship. Chevron argues

---

[10]Exhibit A, p. 16, to Plaintiffs' Memorandum in Opposition (rec. doc. 168).

[11]*Plaintiffs' Memorandum in Opposition* (rec. doc. 168), p. 6.

that plaintiffs have deposed several witnesses involved in the accident, and have extensively cross-examined them regarding the contents of the Minerals Management Service report[12] and Chevron's subsequent remedial measures taken in response to the accident. Chevron states that there are several photos of the platform taken on the day of the accident, and the testimony of Mr. Ritchey as to what he saw is unnecessary. Furthermore, Chevron reurges its argument that the RCA is attorney-client privileged, as a communication from Chevron employees to its legal counsel, under Upjohn Co. v. United States, 449 U.S. 383, 101 S.Ct. 677 (1981).

***Applicable Law***

Rule 510 FRE dictates that the federal common law of privilege governs this maritime law case. Rule 510 reads in pertinent part as follows:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.* * *

The burden of demonstrating the applicability of the attorney-client privilege or the qualified work product immunity rests on the party who invokes it. Hodges, Grant & Kaufmann v. United States, 768 F.2d 719, 721 (5th Cir. 1985). Therefore, the burden rests on Chevron to demonstrate that either the attorney-client privilege or work-product immunity is applicable to any of the categories of information Chevron seeks to protect from disclosure.

---

[12]This was apparently an investigative report performed by MMS.

*Attorney-Client Privilege*

The attorney-client privilege protects from disclosure confidential communications made to obtain a lawyer's professional advice and assistance. S.E.C. v. Brady , 238 F.R.D. 429, 438 (N. D.Tex.2006). The purpose of the attorney-client privilege is to encourage candid communications between client and counsel. Upjohn, 449 U.S. at 390-91. *See also* In re Fischel, 557 F.2d at 209. Although an expansive application of the attorney-client privilege to corporations may impose severe burdens on discovery and create a broad "zone of silence" over corporate affairs, Upjohn, 449 U.S. at 395, effective representation by counsel "depends upon the lawyer being fully informed by the client." Id. at 389; Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona 881 F.2d 1486, 1492 (C.A.9 (Ariz.),1989). As explained by the Fifth Circuit, "'what is *vital* to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer.'" U.S. v. El Paso Co., 682 F.2d 530, 538 (5th Cir. 1982) (emphasis added).

A party invoking the attorney-client privilege must establish: (1) that there was a communication between client and counsel; (2) the communication was intended to be confidential; (3) the communication was, in fact, kept confidential; and (4) the communication was made for the purpose of obtaining or providing legal advice. U.S. v. Construction Products Research, Inc., 73 F.3d 464, 473-74 (2nd Cir.1996).

In U.S. v. El Paso Co., 682 F.2d 530 (5th Cir. 1982), the Fifth Circuit noted the holding of Upjohn, that "[b]ecause the purpose of the attorney-client privilege is to promote the flow of information to the attorney to enable him to give informed legal advice, communications from lower echelon employees were within the privilege as long as the communications were made to

the attorney to assist him in giving legal advice to the client corporation." El Paso Co., 682 F.2d 530, 538, fn.8, *discussing* Upjohn, 101 S.Ct. at 682-86.

"The attorney-client privilege protects two related, but different, communications: (1) confidential communications made by a client to his lawyer for the purpose of obtaining legal advice; and (2) any communication*439 from an attorney to his client when made in the course of giving legal advice, whether or not that advice is based on privileged communications from the client." S.E.C. v. Brady, 238 F.R.D. 429, 438 -439 (N.D.Tex.,2006) *citing* U.S. v. Mobil Corp., 149 F.R.D. 533, 536 (N.D.Tex.1993).

> Even assuming that the information plaintiffs need to establish their claims cannot be discovered from any source other than the statement Gardner gave to Admiral's counsel, we decline to establish an unavailability exception to the attorney-client privilege. The premium paid to preserve the attorney-client privilege, as with all evidentiary privileges, can be high, rendering ascertainment of the truth more problematic. Nonetheless, an unavailability exception to the privilege is an unacceptable solution. Such an exception either would destroy the privilege or render it so tenuous and uncertain that it would be "little better than no privilege at all."

Admiral, 881 F.2d at 1495.

Plaintiffs, in their opposition, expressly state that they have no intentions of questioning Mr. Ritchey regarding any conversations had between Mr. Ritchey and Mr. Smith. Therefore, the undersigned will not address this request any further, except to note that Chevron may object at the deposition on grounds of attorney-client privilege if any such questions are asked.

As to production of the RCA, the undersigned concludes that Chevron has carried its burden to show that the RCA report is protected by the attorney-client privilege. The RCA report was a written communication between the client, Chevron, through its employees, and Chevron's counsel; it was clearly intended to be confidential under the terms of the Legal Charter, and it is

not disputed that it was kept confidential. The RCA was a confidential communication between counsel and client. The investigation was initiated by counsel in order to obtain sufficient evidence to give advice to Chevron and to aid in litigation. The investigators returned the requested information in order to obtain thorough and informed legal advice. While the RCA may have also been made for purposes in addition to legal advice, it was expressly made, in significant part, to evaluate "Chevron's possible involvement and legal exposure, if any...which may be associated with this incident."[13] While recognizing that while non-disclosure of the RCE may possible impede the discovery process, the undersigned finds the RCA must be protected under the privilege in order to serve the purpose of the rule. Further, it is clear the plaintiff simply seeks the facts which are discoverable and can be addressed at the deposition.

While the RCA may have also been made for purposes in addition to legal advice, it was expressly made, in significant part, to evaluate "Chevron's possible involvement and legal exposure, if any...which may be associated with this incident."[14]

The plaintiffs do not submit any argument that this privilege has been waived, and Chevron presents strong argument that it has not been. Therefore, the undersigned finds that the RCA is protected from disclosure under the attorney-client privilege, and need not be produced.

***Work-Product Doctrine***

The qualified work product doctrine was first articulated by the Supreme Court in Hickman v. Taylor, 329 U.S. 495 (1947), and was codified in 1970 as Federal Rule of Civil Procedure 26(b)(3). *See* Chiasson v. Zapata Gulf Marine Corp. 988 F.2d 513, 514 (5th Cir.1993).

---

[13] Chevron Legal Charter, Exhibit 1 to Chevron's memorandum.

[14] *Ibid.*

Under the rule, documents or tangible things "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)," are generally protected from discovery. Rule 26(b)(3).[15] Two categories of materials are protected: ordinary work-product and opinion work product. <u>Reedhycalog UK, Ltd. v. Baker Hughes Oilfield Operations Inc.</u>, No. 6:06 CV 222, 2007 WL 1217897, *2 (E.D.Tex. Apr. 24, 2007). Work product which contains the mental impressions, conclusions, opinion, or legal theories of a party's attorney or other representative has become known as "opinion work product" which is afforded a high degree of protection. *See* 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2026 (2d ed.2007). Ordinary work product has more limited protection against discovery, and may be obtained "upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." <u>Hodges, Grant & Kaufmann v. United States</u>, 768 F.2d 719, 721 (5th Cir. 1985). The burden of

---

[15] Rule 26(b)(3) provides in pertinent part:

**(3) Trial Preparation: Materials.**

(A) Documents and Tangible Things. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

    (i) they are otherwise discoverable under Rule 26(b)(1); and

    (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

(B) Protection Against Disclosure. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

establishing that a document is work product is on the party who asserts the claim, but the burden of showing that the materials that constitute work product should nonetheless be disclosed is on the party who seeks their production. Id., 768 F.2d at 721, citing Hickman, 329 U.S. at 511-12, 67 S.Ct. at 394, 91 L.Ed. at 462- 63.

As the undersigned informed counsel during the telephone conference on March 24, 2009, a full work product analysis is unnecessary, since the RCA is protected under the attorney-client privilege. However, there are persuasive facts supporting plaintiffs' contention that the RCA should be produced. As Judge Rubin pointed out in a similar case, since "the injured party is no longer alive to give his own account," plaintiffs had a "substantial need" under Rule 26(b)(3) for witness statements. Hamilton v. Canal Barge Co. 395 F.Supp. 975, 976 (E.D.La. 1974). Furthermore, as in Hamilton, the witnesses here were interviewed almost immediately after the accident, when their recollections were fresh, facts which weigh in favor of a finding that plaintiffs cannot obtain the equivalent information.[16]

On the other hand, unlike Hamilton, no witness statements were taken or recorded - rather, the RCA contains summaries of the information provided. Additionally, a substantial part of the RCA contains mental impressions and conclusions of the RCA team, which enjoy greater protection against disclosure. Finally, in accordance with the discussion below, plaintiffs will be able to discover the facts during Mr. Ritchey's deposition, and they already have access to witnesses, photos of the platform, and the MMS report.

---

[16] In Hamilton, eyewitness statements taken the day of the accident by the defendant's insurance adjustor were held to be discoverable.

*Limiting the Deposition Testimony of Mr. Ritchey*

Neither the attorney-client privilege nor the work-product doctrine protect underlying facts from discovery. Addressing underlying facts and the attorney-client privilege in Upjohn, the Court specifically stated as follows:

> "[T]he protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, "What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to this attorney."

Upjohn, 449 U.S. at 396 citing City of Philadelphia, Pa. v. Westinghouse Elec. Corp., 205 F.Supp. 830, 831 (E.D.Pa. 1962).

The Fifth Circuit, in In Re International Systems and Controls Corp., Securities Litigation, 693 F.2d 1235 (5th Cir.1982), addressed the work-product immunity issue and stated: "We know that the work-product immunity protects only the documents themselves and not the underlying facts." Id. at 1240. The court noted that it was improper for defendants' attorneys to prevent plaintiff from questioning a deponent about facts involving a special review conducted by the company. Id. at p. 1240, n. 7.

Similarly, the plaintiffs may question Mr. Ritchey about the facts of the investigation underlying the RCA, including any statements made by witnesses and other team members involved in the investigation of the accident. Neither Mr. Ritchey nor the other team members are attorneys, and statements made to them by witnesses, and statements made by team members to witnesses or to each other, are not privileged. While Chevron argues that any such witness statements are intangible work-product, it does not cite any Fifth Circuit authority for that

argument, and in the absence of same, the undersigned is not willing to extend the work-product doctrine to intangible information held by non-attorneys.

*Conclusion*

For the reasons given above,

**IT WAS ORDERED** that Chevron, USA, Inc.'s Motion to Quash Deposition Subpoena Directed to Tony Ritchey, and to Limit Examination of Tony Ritchey (rec. doc. 165) is **GRANTED IN PART AND DENIED IN PART** as follows:

1) The Root Cause Analysis report need not be produced;

2) Concerning the questioning of Mr. Ritchey, the following guidelines apply[17]:

   (A) Counsel may inquire into the Mr. Ritchey's knowledge of the facts relevant to the subject matter of this action regardless of whether the knowledge was gained in the course of the RCA investigation and/or was at some time discussed with counsel.

   (B) Such inquiry may not, however, include questions that tend to elicit the specific questions posed to Mr. Ritchey by Mr. Smith, Chevron's counsel, the generalized inquiry pursued by Chevron's counsel, the facts to which Chevron's counsel appeared to attach significance, or any other matter that reveals Chevron's counsel's mental impressions concerning this case.

3) All other requested relief is **DENIED**.

Signed at Lafayette, Louisiana, on March 25, 2009.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)

---

[17] See Nutmeg Ins. Co. v. Atwell, Vogel & Sterling A Div. of Equifax Services, Inc., 120 F.R.D. 504, 509 (W.D.La.,1988)